# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| NICOLE TULLOCK, | ) |
| Plaintiff, | ) |
| vs. | ) Case No. 14 C 3066 |
| LORETTO HOSPITAL, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Plaintiff Nicole Tullock has sued her former employer, Loretto Hospital, claiming that Loretto violated Title VII of the Civil Rights Act of 1964. Tullock alleges that Loretto disciplined her and then terminated her employment based on her gender, 42 U.S.C. § 2000e–2(a), and in retaliation for making a complaint about gender discrimination, 42 U.S.C. § 2000e–3(a). Loretto has moved for summary judgment on both of Tullock's claims. For the reasons stated below, the Court denies Loretto's motion.

## Background

The following facts are undisputed. The Behavioral Health Unit at Loretto Hospital houses patients who are being treated for mental health conditions. These patients often have other medical conditions and substance abuse issues, and some patients are prone to violence and suicide. For these reasons, the Behavioral Health Unit is staffed with health professionals who can provide care and regularly monitor the patients to ensure their health and safety.

Tullock began working as a Mental Health Specialist (MHS) in Loretto's Behavioral Health Unit in September 2012. She was assigned to work the evening shift (3:00 p.m.–11:00 p.m.) on Fridays and both the evening and night (11:30 p.m.–7:00 a.m.) shifts on Saturdays and Sundays. As an MHS, Tullock was responsible for monitoring and providing basic physical care to the unit's patients. This meant that in addition to tending to patients when they experienced discomfort and satisfying their reasonable requests for food and water, Tullock was also responsible for conducting "rounds" during her shift. As defined in Tullock's job description, the rounds requirement meant that every fifteen minutes, at least one MHS would walk around the unit to observe every patient and document each patient's status. For the first five months of her employment, Tullock did not receive any feedback from her supervisors or other superiors at Loretto that indicated her performance was substandard.

On February 24, 2013, Margaret Adetuyi—another MHS on Tullock's shift—filed a complaint against Tullock. Adetuyi claimed that Tullock became hostile and argumentative and called her lazy in front of patients after she asked Tullock to change the linens on the bed of a patient who had soiled himself. Tullock disputed (and continues to dispute) Adetuyi's account. In a meeting the following day with her supervisors, Kasaundra Harrold and Jessica Phipps, Tullock claimed that the patient had not actually urinated in bed. She said that what actually happened was that Adetuyi verbally attacked her. Tullock also told Harrold and Phipps that she felt that Adetuyi's attack was symptomatic of the hostile working environment in the Behavioral Health Unit. During her deposition, Tullock clarified that by "hostile," she meant that the environment was contentious, with frequent altercations between staff and "nurses

2

about to fight" one another.  Def.'s Ex. 4, dkt. no. 38-9, at 21.

Also on February 25, 2013, night supervisor Millicent Nartey emailed Tullock's supervisor Harrold to report that a patient of Tullock's had complained that Tullock yelled at her and refused to provide her a towel so she could dry off after a shower. Nartey reported that Tullock "became loud and defensive to the point of rudeness" when confronted about the patient's complaint and that she "found it difficult to communicate with [Tullock] because of her disposition (loud, defensive)."  Def.'s Ex. 4-F, dkt. no. 38-15, at 2.  Harrold forwarded Nartey's email to Phipps a few days later.  Tullock does not dispute that Nartey made this report to Harrold or that the patient complained to Nartey. Tullock adamantly disputes, however, the veracity of both the patient's complaint and Nartey's account of her exchange with Tullock.

On March 3, 2013, Tullock printed four patients' medical records from Loretto's computer system in order to show Phipps that Tullock's notes on the files did not evince any problems between Tullock and her patients.  Tullock did so knowing that federal law prohibits health care providers from giving documentation about a patient's care to someone who is not involved in the patient's care.  But although Loretto characterizes these records as "confidential medical records," Def.'s Stat. of Material Facts, dkt. no. 37, at ¶ 18, it concedes that these medical records were marked non-confidential in Loretto's system.  Def.'s Resp. to Pl.'s Add'l Facts, dkt. no. 56, at ¶ 5.  Loretto also admits that Phipps was involved in these patients' care.  Id. ¶ 7.

Tullock was accused of verbally accosting another patient eight days later.  In a written complaint, the patient stated that Tullock had yelled at her, lied to her, called her a troublemaker and a liar, and was hostile after the patient complained that the ice

3

Tullock had given her tasted bad.  Tullock testified during her deposition that the patient's account was not accurate.  She said that although she did tell the patient that she should not have eaten the entire cup of ice if it did not taste good, she neither raised her voice nor called the patient any names.

On March 18, 2013, Tullock submitted a letter to Ivan Brown (the Loretto official who had interviewed her for her position), Loretto's President and CEO Sonia Mehta, and Loretto's Vice President and Chief Nursing Officer Susan Kranzer.  This letter began:

> A hostile work environment is a situation in which an employer or coworker's repeated action make [sic] it impossible for an employee to perform his or her job duties.  According to the U.S. Equal Employment Opportunity Commission, every employee has a right to work in an environment that is free of hostility.  When you have a supervisor who ignores that right and continues to create a hostile workplace environment, you can take steps to prevent it.  By submitting a grievance letter to your company's human resources or employee relations department, you can invoke change.  In order to prevent a lawsuit, your employer is likely to address and correct the hostile workplace environment swiftly.

Def.'s Ex. 4-C, dkt. no. 38-12, at 2.  She used the remainder of her letter to inform Loretto officials that Adetuyi's allegations against her were false, that her supervisors were uninterested in her side of the story, and that Phipps and others were not doing enough to eliminate hostility from the workplace.  Tullock did not reference her gender or contend that the hostile work environment was gender-based.

Before she made this complaint, Tullock had never been disciplined during her employment with Loretto, including for any of the incidents described earlier.  On April 12, however, Harrold and Phipps met with Tullock to discuss her alleged misconduct and provide her with a "final written warning."  The written warning identified three official conduct violations.  First, it stated that Tullock had misused confidential

4

information or disclosed it without authorization, which Loretto's discipline policy classifies as a "critical offense" that can justify suspension and/or termination. Second, it stated that Tullock had verbally abused the patient who complained about her cup of ice, a "major offense" worthy of suspension and/or termination. Third, it stated that Tullock had committed a "minor offense" because she called a fellow staff member lazy in front of patients and staff and because she "[did] not communicate professionally and create[d] a hostile work environment." Def.'s Ex. 4-D, dkt. no. 38-13, at 2. Tullock refused to sign the final written warning, and she insisted to Phipps and Harrold that she had committed none of the three offenses it alleged.

In early June 2013, Tullock submitted a letter to Phipps memorializing an earlier complaint she had made to Harrold about a male coworker. In her letter, Tullock accused her coworker of "harassing and verbally attacking" her on multiple unspecified occasions and of fighting with another female employee. A week later, Harrold handed Tullock a "first written warning" alleging that she was late for her shifts on six occasions in late April and early May. Tullock does not dispute that she was late on those days or that the disciplinary action form she was given was an appropriate response.

Tullock worked her normal double shift from 3:00 p.m. on June 23 until 7:00 a.m. on June 24, 2013. At 6:30 a.m., a patient submitted a complaint stating that she observed Tullock sleeping in front of her computer. In the complaint, the patient reported that she "simply said to [Tullock] sorry to wake you but can I get remote [sic] . . . [Tullock] is always nodding even in daytime. I have seen her nodding standing up." Def.'s Ex. 4-K, dkt. no. 38-20, at 2. The patient wrote that she was a recovering drug addict and wondered if Tullock's drowsiness was due to the influence of drugs.

5

According to the complaint, Tullock "snapped" at the patient and replied that she was not sleeping. The complaint was delivered to supervisor Harrold, who sought the counsel of Loretto's Human Resources Manager, Shannon Shumpert, to determine how best to proceed. Shumpert advised Harrold to interview the patient and Tullock and review video footage taken by one of the apparently numerous security cameras in the Behavioral Health Unit.

Shumpert, Phipps, and Harrold all reviewed the footage from the time of the alleged incident and concluded that Tullock appeared to be sleeping during her shift. They also concluded, based on the footage, that Tullock failed to complete her required rounds at 5:45 a.m. and 6:30 a.m., which was a problem not only because she was required to complete them, but also because Tullock had signed paperwork attesting to their completion. A few days later, Phipps and Harrold brought Tullock in to discuss these allegations and show her the video. Tullock immediately disputed whether the video actually showed her sleeping. She also contended that her rounds were in fact completed in compliance with standard policy because she was under the impression that Phipps and Harrold permitted MHSes to work in pairs. Tullock insisted that she had not falsified her rounds paperwork because she signed it after conducting rounds, albeit through Cola Needham, another MHS who walked from patient to patient to observe and report back to Tullock. Phipps asked Tullock to submit a written statement summarizing her position on the incident, but Tullock refused to do so. Phipps initiated an investigation and suspended Tullock pending the investigation.

Tullock spent the next few days contacting upper management to communicate her displeasure with Phipps and Harrold and to deny the allegations they had leveled

6

against her. Tullock called Kranzer and Mehta (the CEO, who Tullock had earlier notified that she felt subjected to a "hostile work environment") to complain about her suspension and to complain that Harrold and Phipps were mistreating her. During her call to Kranzer, Tullock specifically claimed that she felt Loretto management was discriminating against her on the basis of her gender. When she called Mehta, he connected her with Shumpert. Tullock also sent a letter to Mehta that again referred to her "hostile work environment" and claimed that Phipps was retaliating against her, inventing allegations against her, and attempting to create a paper trail to justify terminating her.

Tullock received a letter from Phipps in early July 2013 stating that Phipps's investigation substantiated the claims that Tullock had been sleeping during her shift and had falsified medical records. The letter also noted that Tullock had previously received a final warning but had continued to perform unacceptably. In light of all of this, the letter served as notice that Tullock's employment was terminated. In August 2013, Tullock filed a charge of discrimination against Loretto with the Equal Employment Opportunity Commission, claiming gender discrimination and retaliation in violation of Title VII. The EEOC issued a right to sue letter to Tullock in late January 2014. Tullock then filed this lawsuit. Upon the close of discovery, Loretto moved for summary judgment.

## Discussion

Summary judgment is proper when the moving party "shows that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On a motion for summary judgment, the Court

7

draws reasonable inferences in favor of the non-moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006). The Court's "function is not to weigh the evidence but merely to determine if there is a genuine issue for trial." *Bennett v. Roberts*, 295 F.3d 687, 694 (7th Cir. 2002). "Summary judgment is not appropriate 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

     Loretto first argues that Tullock has failed to adduce evidence sufficient to withstand summary judgment on her claim that she was terminated because of her gender. To prevail on her claim, Tullock must show that she was subjected to intentional discrimination based on her gender. *See Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 717 (7th Cir. 2012) ("[D]ifferential treatment claims, also known as disparate treatment claims, require plaintiffs to prove discriminatory motive or intent."). Because Tullock does not offer any direct evidence that her discharge was discriminatory, the Court must evaluate her claim under the familiar burden-shifting analysis set forth in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973). Tullock must make out a prima facie case of gender discrimination by producing evidence that supports the reasonable inference that: "(1) she is a member of a protected class; (2) she met her employer's legitimate job expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside of the protected class were treated more favorably." *Chaib v. State of Indiana*, 744 F.3d 974, 981 (7th Cir. 2014) (internal quotation marks omitted). If she does this, the burden shifts to Loretto "to introduce a legitimate, nondiscriminatory reason for the employment action." *Id.* at 982 (internal

quotation marks omitted). If Loretto does so, the burden shifts back to Tullock, whereupon she must adduce evidence that supports a reasonable inference that Loretto's proffered reason is pretextual.

Loretto argues that it should be granted summary judgment for three reasons. First, it contends that Tullock has failed to establish a prima facie case because the evidence indisputably shows that she was not meeting Loretto's reasonable expectations. Second, Loretto argues that Tullock has failed to point to a similarly situated male employee who was treated more favorably. Third, Loretto insists that Tullock has adduced no evidence tending to show that Loretto's proffered explanation for her termination—that she slept on the job and falsified medical records, and that she had committed these violations even after receiving a final warning for earlier critical and major violations—was pretextual.

The Court disagrees. To support its argument that Tullock was not satisfying its reasonable business expectations, Loretto points out that it is undisputed that complaints were filed against her on multiple occasions, she was tardy for work a few times, and she violated official policy by printing confidential medical records and yelling at patients. But the question whether Tullock's performance met Loretto's expectations is hotly disputed. Tullock admits that complaints were filed, but she denied their veracity both at the time they were filed and during her deposition. Tullock admits that she received a warning letter for days she was tardy, but neither party seems to believe that her tardiness was particularly egregious or constituted a failure to meet company standards. And the evidence on the record arguably shows that although Tullock did print and deliver medical records to Phipps, those records were not confidential and

Phipps was authorized to view them. Simply put, Tullock has adduced evidence that would permit a jury to reasonably find that she was meeting her employer's legitimate expectations.

Loretto's argument about similarly situated employees is likewise unavailing at the summary judgment stage of the case. Over the course of discovery, Tullock attempted to adduce comparator evidence through a handful of depositions. During her own deposition, Tullock testified that male MHS Needham was "not doing his share of the work," but was not disciplined; male MHS Tucker and male MHS O'Neal slept during their shifts but were not disciplined; and male MHS Hunt signed off on rounds sheets without personally observing patients but was not disciplined. Tullock also took the depositions of MHS Eric Campbell and MHS Lynda Robinson. Campbell testified that he observed Tucker and O'Neal sleeping on the job on multiple occasions in 2013 or early 2014 in plain view of the Behavioral Health Unit's security cameras and that they both continued to work for Loretto even after these incidents. Robinson testified that Hunt continued to work for Loretto even after an incident in 2013 in which he signed a document stating that he had observed a patient in his bed during rounds, when in reality the patient had left the facility and could not be found.

"Similarly situated employees must be directly comparable to the plaintiff in all material respects, but they need not be identical in every conceivable way." *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (internal quotations omitted). Indeed, the Supreme Court has cautioned that "precise equivalence . . . between employees is not the ultimate question." *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 283 n.11 (1976). "Although the similarly situated inquiry is not a mechanical comparison, it

requires enough common factors to determine if intentional discrimination was at play." *Cung Hnin v. TOA (USA), LLC*, 751 F.3d 499, 504 (7th Cir. 2014); *see also Barricks v. Eli Lilly & Co.*, 481 F.3d 556, 560 (7th Cir. 2007).  A plaintiff typically "must at least show that the comparators (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Coleman*, 667 F.3d at 847.

Loretto does not dispute that Tucker, Hunt, and O'Neal were supervised by Phipps and Harrold, nor does it dispute that the same standards applicable to Tullock were applicable to these men in their capacities as MHSes.  Loretto also does not seem to dispute that the record contains evidence that would permit a jury to determine that these men engaged in similar conduct and were not immediately disciplined.  Specifically, Loretto does not contest that there is evidence showing that Tucker and O'Neal slept on the job, that Hunt attested to completing rounds when he did not in fact observe his patients, or that none of these men was terminated after allegedly violating official policy.  Instead, Loretto argues that there is one circumstance that distinguishes these incidents, namely, that Loretto never knew these male MHSes violated official policy.  Had it known, says Loretto, it would have terminated them, just as it says it has done over the last five years to twenty-four employees (thirteen males) who falsified hospital records and twelve employees (six males) who were caught sleeping on the job.

This argument neglects the fact that the record contains testimony that, if believed, tends to show that Loretto was aware of these alleged violations.  First, there

11

is evidence from which a reasonable jury could find that Loretto officials knew that Hunt and others were falsifying their rounds records. Tullock, Campbell, and Robinson all testified that during the time period when Phipps and Harrold were in charge, the staff often did rounds in pairs, with one MHS observing and the other recording and signing rounds sheets. Campbell and Robinson also testified that they became aware of Hunt's misconduct because word was spreading through the unit. Second, there is evidence from which a reasonable jury could find that Loretto knew about Tucker and O'Neal. Tullock and Campbell both testified that Tucker slept on multiple occasions in plain view of the cameras, and Campbell testified about waking O'Neal on more than one occasion.

Third, there is evidence that supervisors in the Behavioral Health Unit had their fingers on the pulse of the unit and knew when misconduct was occurring. Sometimes, they knew because nurses reported misconduct: Campbell recalled a time, for example, when Phipps chastised him for arguing with a colleague in the hallway, even though Phipps had not been present for the argument, making it reasonable to infer someone had reported it. Other times, supervisors knew because they watched security footage: Tucker testified in some detail about how ubiquitous security cameras are in the Behavioral Health Unit, and Kora Fields, a registered nurse at Loretto, testified that she became aware that Tucker was sleeping on his shift when hospital security called her to come watch the camera and observe him sleeping.

Loretto essentially asks the Court to require Tullock to produce evidence of a male MHS who slept on the job and falsified medical records and whose conduct, like Tullock's, was immediately brought to the attention of hospital management by way of a

patient's complaint. But "[w]here a proposed comparator violated the same rule as the plaintiff in an equivalent or more serious manner, courts should not demand strict factual parallels." *Coleman*, 667 F.3d at 851. The evidence in the record is sufficient to allow a reasonable jury to determine that Loretto treated Tucker, Hunt, and O'Neal more favorably than Tullock for similar violations of hospital rules. Accordingly, Tullock has carried her initial burden by providing evidence that can support a prima facie case of discrimination.

Loretto's final argument is that even if Tullock has established a prima facie case, she has failed to adduce evidence from which a jury reasonably could infer that Loretto's proffered reason for her termination was pretextual. This is so, says Loretto, because the evidence shows that it routinely terminates both male and female employees when they are caught sleeping on the job or falsifying medical records. Tullock does not dispute that Loretto regularly terminates employees for these reasons. She argues, however, that the evidence shows that although Loretto offered this justification for her termination, her managers did not actually believe that she was guilty of these offenses, and Loretto's proffered justification is a lie designed to conceal discriminatory motives.

To show pretext, Tullock bears the burden of demonstrating that Loretto's "ostensible justification for its decision is unworthy of credence." *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 888 (7th Cir. 2001). "The focus of the pretext inquiry is whether the proffered reason is a lie." *Smiley v. Columbia Coll. of Chicago*, 714 F.3d 998, 1002–03 (7th Cir. 2013). Ultimately, "the question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the

reasons it has offered to explain the discharge." *Cung Hnin*, 751 F.3d at 506 (internal quotations omitted). Tullock may carry her burden by adducing "evidence tending to prove that the employer's proffered reasons are factually baseless, were not the actual motivation for the discharge in question, or were insufficient to motivate the discharge." *Gordon*, 246 F.3d at 888–89; *see also Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 418 (7th Cir. 2006) ("[I]f the stated reason, even if actually present to the mind of the employer, wasn't what induced him to take the challenged employment action, it was a pretext.").

Loretto has regularly discharged employees caught sleeping on the job or falsifying medical records. This is evidence that these offenses are indeed sufficient to motivate a discharge. But the fact that Loretto views these violations as terminable offenses does little to undermine Tullock's contention that Loretto did not actually believe that she had done anything wrong. In other words, Tullock has not attempted to show that falsifying records and sleeping on the job are insufficient to motivate discharge. Instead, she attempts to carry her burden by showing that Loretto's proffered reasons for terminating her are factually baseless and were therefore not the actual basis for her discharge.

When viewed in the light most favorable to Tullock, the evidence she has adduced is sufficient to create a genuine factual dispute regarding whether Loretto's explanation for her termination was pretextual. First, a reasonable jury could conclude that Loretto's decision makers did not actually believe that Tullock was asleep during her shift. Tullock has consistently and adamantly disputed whether the video footage from the night in question actually shows her sleeping, and Phipps, on behalf of Loretto,

14

stated in sworn testimony before the EEOC that she could see Tullock clicking her computer mouse during the time she was alleged to be shown sleeping in the video.[1] Second, Tullock has offered evidence that would permit a reasonable jury to determine that the investigation whose findings ultimately resulted in her discharge was conducted haphazardly. For example, the record contains affidavits from colleagues who were present during the alleged incident but were never interviewed during Phipps's investigation for their account of what happened. Finally, as discussed above, the evidence in the record can support an inference that at the time Tullock worked at the hospital, Loretto did not consider it improper for employees to sign off on rounds they did not themselves complete and did not always immediately discharge employees who were known to be sleeping during their shifts. *See Coleman*, 667 F.3d at 857–58 ("Where the plaintiff argues that an employer's discipline is meted out in an uneven manner, the similarly-situated inquiry dovetails with the pretext question.").

The same reasoning explains why the Court must also deny Loretto's motion for summary judgment on Tullock's retaliation claim. A plaintiff claiming retaliation under Title VII must demonstrate that she engaged in activity protected under the statute and that the defendant took an adverse employment action against her as a result. *See Gross v. PPG Indus., Inc.*, 636 F.3d 884, 892 (7th Cir. 2011). Like disparate treatment claims, a plaintiff who seeks to prove a retaliation claim under Title VII may do so by the direct or indirect method of proof. *Weber v. Univs. Research Ass'n, Inc.*, 621 F.3d 589,

---

[1] Loretto challenges the admissibility of this testimony, but if nothing else, the fact that Phipps so testified before the EEOC is sufficient indication that she would so testify at trial. In other words, her EEOC testimony is the equivalent of deposition testimony, which unquestionably can be used to oppose summary judgment. Thus the Court need not address at this juncture whether the testimony is admissible as a statement by an opposing party under Federal Rule of Evidence 801(d)(2)(A) or (C).

592 (7th Cir. 2010). Tullock does not offer direct evidence of retaliation, so she must proceed on the indirect method.

To make out a prima facie case of retaliation under the indirect method of proof, Tullock must demonstrate that: (1) she engaged in protected activity; (2) she suffered adverse employment action; (3) she met her employer's legitimate expectations; and (4) she was treated less favorably than similarly situated employees who did not engage in protected activity. *See Silverman v. Bd. of Educ. of City of Chicago*, 637 F.3d 729, 742 (7th Cir. 2011). If she can establish a prima facie case, the burden shifts to Loretto to proffer a legitimate non-retaliatory reason for the adverse employment action. Once Loretto has done so, Tullock must establish that Loretto's proffered rationale is a pretext for discrimination.

It is true that Tullock has offered no evidence that she ever clearly invoked the protections of Title VII prior to late June, after she had already been suspended pending investigation. But the evidence would permit a reasonable jury to find that had she not complained to Loretto decision makers that she felt discriminated against based on her gender, she would not have been terminated. Specifically, as explained earlier, the record contains evidence from which a reasonable jury could find that at least some male MHSes who did not complain of discrimination in the workplace were not immediately terminated when they slept during their shifts or falsified medical records and that Loretto decision makers might not actually have believed that Tullock committed the offenses alleged.

## Conclusion

For the foregoing reasons, the Court denies defendant's motion for summary

16

judgment [dkt. no. 35]. The case is set for a status hearing on January 19, 2016 at 9:30 a.m. for the purpose of setting a trial date and discussing the possibility of settlement.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: January 11, 2016